**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ERICO INTERNATIONAL CORPORATION,** | : | **Case No. 1:05-cv-2924** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **DOC'S MARKETING, INC.,** *et al.*, | : | **PRELIMINARY** |
| | : | **INJUNCTION ORDER** |
| **Defendants.** | : | |

Plaintiff ERICO International Corporation ("Plaintiff" or "ERICO") has brought this action against Defendant Doc's Marketing, Inc. ("Defendant" or "Doc's Marketing") and John Doe Company of the Republic of China alleging that Defendant has infringed one of Plaintiff's patents – specifically, its patent relating to its "J-Hook." Plaintiff alleges that: (1) it owns U.S. Patent No. 5,740,994 ("the '994 Patent"), which is directed at a J-Hook and a method for using a J-Hook to support low voltage communication cable(s); and (2) Defendant sells products, and engages in advertising, that indirectly infringes the '994 Patent. Based on these allegations, Plaintiff claims that Defendant willfully has contributed to, or willfully has induced, infringement of the '994 Patent – specifically claim 17, which is a method claim.

On December 20, 2005, Plaintiff filed a *Motion for Temporary Restraining Order / Preliminary Injunction Order* (Doc. 4), which sought to enjoin Defendant from making, using, selling, causing to be sold or offering for sale its allegedly infringing product. On January 5, 2006, Defendant filed a response, in which it argued that Claim 17 of the '994 Patent is invalid, and that Defendant neither induced nor contributed to the infringement of that claim, or the patent as a whole.

On January 13, 2006 the Court <u>denied</u> Plaintiff's request for a temporary restraining order (Doc. 14) and, following failed efforts by the parties to resolve their dispute and a period for

discovery and briefing, set a hearing for March 9, 2006 to address Plaintiff's request for a preliminary injunction. On March 9, 2006, the parties presented evidence in support of their respective positions. At the close of those presentations, the Court orally entered a preliminary injunction in favor of Plaintiff and against Defendant, thereafter noting that this Order would follow.

Upon consideration of the parties' oral and written submissions, and for the reasons outlined both on the record and further below, the Court **FINDS** that it is appropriate to enter a **PRELIMINARY INJUNCTION** in this case.[1]

## I.  BACKGROUND

The facts relevant to the present motion are simple and few. Accordingly, the Court provides only a brief summary here and, to the extent necessary, elaborates further below on those facts particularly relevant to the Court's analysis.

In sum, Plaintiff is a local and leading manufacturer (and developer) of a variety of "fastener" products used in the installation of, among other things, electrical and communication cables in commercial buildings. The product at issue in this case is Plaintiff's "J-Hook," which is a simple, yet innovative, metal device (shaped like a "J") that supports lengths of electrical and communication cable. *See* Figure 6 (right), which appears in Doc. 1-2 at 3. As a result of various marketing, quality control and intellectual property protection efforts, Plaintiff currently enjoys a significant share of the "J-Hook" market and is recognized as an industry leader in that regard.



FIG. 6

---

[1]    This Order is to be read in conjunction with the Court's March 9, 2006 oral rulings. Together they constitute the Court's ruling on Plaintiff's motion.

2

Plaintiff, through inventor Raymond Scott Laughlin, obtained a patent on its J-Hook in April of 1998 (Patent Number 5,740,994).  In sum, the '994 Patent teaches a design for manufacturing, and method for using, the Plaintiff's J-Hooks.[2]  The only portion of the '994 Patent at issue in this case is Claim 17, which is a method claim.  Claim 17 provides:

> 17.  *A method of supporting a run of a bundle of* **low voltage** **communication cable***, comprising the steps of providing spaced supports, each comprised of a curved saddle having smooth down-turned obtuse angle lateral edges, suspending the run from saddle to saddle, and spacing the saddles along the run so that the run sags between the saddles no more than about 30 cm below the saddles.*  (emphasis added)

This method is illustrated in Figure 18 (right), which appears in the '994 Patent.  *See* Doc. 1-2 at 4.

In January of 2000, the '994 Patent was reexamined by the United States Patent and Trademark Office ("PTO").  Based on newly discovered prior art, the examiner recommended cancellation of many of the patent's claims.  Over Plaintiff's objections, the Board of Patent Appeals and Interferences ("BPAI") confirmed the cancellation of



FIG. 18

Claims 1-4, 6-8 and 27-38 of the '994 Patent in March of 2003.  Claim 17, however, was left in tact by both the examiner and the BPAI.  Plaintiff did not appeal the BPAI's ultimate ruling.

---

[2]  As explained during the March 9, 2006 hearing, Plaintiff manufactures a variety of J-Hooks – *i.e.*, different sizes, load strengths, *etc.*  For ease of reference, however, the Court refers herein to J-Hooks generally without specifying particular models or product numbers, which are irrelevant to the Court's analysis.

In the summer of 2005, Plaintiff discovered that Defendant was "knocking off" its J-Hooks by sending them to China to be copied en mass for sale in the United States.  Indeed, Defendant's president, Forrest Dockery, openly testified at the March 9, 2006 hearing that he directly copied Plaintiff's J-Hook design by sending samples to a Chinese manufacturer for duplication. Characterizing his entry into the market with lower priced (and lower quality) J-Hooks as "competition," Mr. Dockery testified that he simply was pursing the "American way."  *See* Figure 1 (right), which illustrates the similarities between the parties' respective J-Hooks and appears at Doc. 5-1 at 4.



Plaintiff initially was alerted to Defendant's alleged infringing activities when Plaintiff saw an advertisement announcing Defendant's introduction of a competing J-Hook product.  Plaintiff was further alerted when one of its distributors informed Plaintiff that it had received comparative price sheets from Defendant in an attempt to convince the distributor to sell Defendant's J-Hooks instead of Plaintiff's J-Hooks.  Defendant's products were notably less expensive, which, for obvious reasons, caught the distributor's attention.  Offended by the Defendant's seeming indifference to Plaintiff's intellectual property rights, and fearing lost sales and damage to its reputation due to the knock offs' inferior quality (as reflected by their price and failure in load testing conducted by Plaintiff), Plaintiff contacted Defendant and informed it that Plaintiff had a patent on its J-Hook and that Defendant was infringing Plaintiff's patent by copying and marketing its knock off J-Hooks. While Defendant defended its conduct to some extent, it assured Plaintiff that it did not want to

4

infringe anyone's patent.  To that end, Defendant assured Plaintiff that it would not sell any of the J-Hooks in its inventory and would not order more.  Thereafter, however, Defendant sold the very products it promised to retain and continued to manufacture and sell knock off J-Hooks.  Though Defendant's subsequent knock offs were slightly modified (several times), materially they remained identical to the Plaintiff's J-Hooks.[3]

Accordingly, Plaintiff filed this action seeking to enjoin Defendant's alleged infringement of Claim 17 of Plaintiff's '994 Patent.  In response, Defendant has challenged the validity of the '994 Patent, specifically Claim 17.

## II.    DISCUSSION

In exercising their discretion to enter preliminary injunction orders, courts are to consider four factors:

(1)    whether Plaintiff has a reasonable likelihood of success on the merits;

(2)    whether Plaintiff likely will suffer irreparable harm if the alleged conduct continues;

(3)    the balance of hardships on the parties; and

(4)    the impact of the injunction on the public interest.

*Oakley Inc. v. Sunglass Hut, Int'l,* 316 F.3d 1331, 1338-39 (Fed. Cir. 2003).  In the present case, the Court finds that the Plaintiff has satisfied these factors.  Accordingly, entry of a preliminary injunction in Plaintiff's favor is warranted.

---

[3]    The first round of J-Hooks Defendant obtained from China were such direct copies of Plaintiff's products that they actually bore Plaintiff's trademarks. Defendant had those marks "scratched out" before distribution, leaving obvious scrapings on that inventory.

5

### A.    Likelihood of Success on the Merits

Turning first to the Plaintiff's likelihood of success on the merits, the Defendant argues that the '994 Patent is invalid, and, therefore, no meaningful infringement has occurred, or can occur. In this regard, Defendant presents three challenges to the validity and/or enforceability of the patent. For the reasons outlined below, the Court finds that none of the Defendant's challenges *likely* will prevail. The Court further finds that, separate and apart from Defendant's claims that the patent – or claim, in so far as only a single claim is at issue here – is invalid (or unenforceable), the Plaintiff likely will prevail in proving that Defendant has infringed the patent.

### *1.    Defendant's Validity Challenges*

*First*, Defendant argues that the '994 Patent is invalid (or otherwise unenforceable) due to inequitable conduct stemming from Plaintiff's failure to disclose material information to the PTO during the patent's prosecution – namely, disclosure of the 1990 EIA/TIA standard that sets forth a spacing standard for open-top cable supports.[4]  The Court finds the Defendant's argument unpersuasive, however, given that the '994 Patent expressly references "conforming standards" and describes those standards in the same way as does the 1990 EIA/TIA standard. The Court is not dissuaded by the fact that the 1990 EIA/TIA standard did not itself appear in the "Background" section of the patent, or that the patentee did not identify the standards by name. There is a direct reference to "conforming standards" in the patent, and a discussion of the fact that the patent's spacing requirements are consistent with those standards. In light of these references, the Court finds that it is not *likely* that the PTO was deceived into believing that no such conforming standard

---

[4]    Though not specifically characterized as such, Defendant's first invalidity argument technically is an "enforceability" argument, premised on alleged inequitable conduct by the Plaintiff.

6

existed, especially given that the standard in question was in the public domain.

As Plaintiff pointed out, moreover, the Defendant did not attempt to prove "intent to defraud," which is a necessary element of any inequitable conduct claim (defense).  *Ferring B.V. v. Barr Laboratories*, 437 F.3d 1181, 1202 (Fed. Cir. 2006).  Where, as here, the patent points the reader (including any reasonable examiner) to the very standards Defendant asserts are relevant, it is hard to conceive that Defendant could prove an intent to deceive, especially by clear and convincing evidence.  The Court finds, therefore, that Defendant's argument that the Plaintiff engaged in inequitable conduct – thereby rendering the '994 Patent invalid, or unenforceable – *likely* is not meaningful in the context of this case.

*Second*, Defendant argues that the '994 Patent is invalid under 35 U.S.C. § 102(b) because the patented product was "on sale" in the United States more than one year before the patent's filing date.  In this regard, Defendant argues only that people in the industry were pulling cable "taut" during installation – *i.e.*, generally practicing certain aspects of the method claim – more than one year prior to the filing date of the '994 Patent.  Defendant has presented no evidence, however, that anyone actually practiced Claim 17's method by using a J-Hook more than one year prior to the filing date of the '994 Patent.  On the record presented, therefore, § 102(b) *likely* does not apply.  The Defendant simply has not presented evidence of an "on sale" bar event within the meaning of 35 U.S.C. § 102.  The Court, therefore, rejects this argument.

*Third*, Defendant argues that Claim 17 is invalid under 35 U.S.C. § 103 because the combination of a prior art J-Hook with the methodology outlined in Claim 17 would have been "obvious," as defined in the statute, in light of everything that existed in the public domain before the patent's filing date.  Specifically, Defendant asserts that the combination of a foreign J-Hook

reference (*i.e.*, the OBO Betterman brochure disclosing a "OBO Kabeltrag-Systeme KTS '94" hook) with the 1990 EIA/TIA spacing standards was obvious and that is all Claim 17 teaches.  The Court finds that this argument also *likely* will fail.

The relevant question here is whether or not the Defendant has put forward sufficient evidence to at least raise the specter that the '994 Patent would be invalidated in order to overcome any other findings the Court might make with respect to infringement.  As always, the Court begins with the presumption that the patent is valid.  *Perricone v. Medicis Pharmaceutical Corp.*, 432 F.3d 1368, 1372 (Fed. Cir. 2005).

In this case, the '994 Patent's claims were examined twice by the PTO, and Claim 17 survived both examinations.  In that regard, the Betterman J-Hook (upon which the Defendant relies), was brought to the PTO's attention during the reexamination.  Further, as noted above, the patent itself (in column 8, line 10) references "conforming standards" that existed at the time.  The "conforming standards" identified in the patent are the very spacing requirements set forth in the 1990 EIA/TIA standard (ANSI / ERI/TIA-569-1990, "Commercial Building Standard for Telecommunications Pathways and Spaces"), upon which the Defendant now relies. It appears to the Court, therefore, that the PTO had before it sufficient information from which it could analyze the very questions the Defendant now raises with respect to obviousness under 35 U.S.C. § 103.

The Court recognizes that it is not bound by the findings of the PTO, and that it could still find that Claim 17 is "obvious" in light of these prior art references, or others, after a more careful examination of the method claim.  At this stage of the proceeding, however, the Court finds that it is *not likely* Defendant will be able to prove that Claim 17 is invalid under § 103 because the PTO had sufficient information before it during its prior examinations to assess the very obviousness

8

claim Defendant now raises, and because secondary considerations of nonobviousness cut in the Plaintiff's favor.  Briefly, the Court outlines below ceratin secondary considerations relevant to its conclusion.

One secondary consideration of nonobviousness is a "long felt need in the art." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (U.S. 1966).  Unrebutted testimony at the March 9, 2006 hearing established that, prior to the invention taught in the '994 Patent, there was a long felt need in the industry for an improved method for hanging – or otherwise supporting – low voltage communication cable.  There was also testimony that those skilled in the art immediately accepted, in fact embraced, the '994 Patent's invention.  Accordingly, it appears that there was a long felt need in the art for Plaintiff's invention.  "Commercial success" is yet another secondary consideration of nonobviousness.  *Id*.  Based on the evidence presented, there simply is no dispute that Plaintiff's J-Hooks, and the method of use described in Claim 17, are commercially successful.  Further, "copying" is a compelling secondary consideration.  Here, Defendant openly has admitted that it engaged in <u>direct</u> copying of the Plaintiff's patented products.  *Id*.

The Court finds, therefore, that secondary considerations of nonobviousness cut in the Plaintiff's favor, <u>and</u> that it is unlikely that the Defendant will prove that Claim 17 is invalid under 35 U.S.C. § 103 by the combination of the OBO brochure and the 1990 EIA/TIA standard. Accordingly, the Court finds that it is *not likely* the Defendant will succeed in proving that the '994 Patent is invalid or enforceable.  As such, the Plaintiff enjoys a likelihood of success on the merits on these issues.

9

### 2.    *Infringement Analysis*

In this case, demonstrating a "likelihood of success" further requires that the Defendant likely will be found to have infringed Claim 17 of the '994 Patent.  An infringement determination involves a two-step analysis.  *Elekta Instrument S.A. v. O.U.R. Scientific Int'l., Inc.*, 214 F.3d 1302, 1306 (Fed. Cir. 2000).  The first step is to construe the claim in question to determine its scope and meaning.  *Id.*  The second step is to compare the construed claim with the accused device or process. *Id.*  It is well-settled that the construction of the terms in a patent is an issue to be determined by the Court, as a matter of law.  *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 976 (Fed. Cir. 1995), *affirmed*, 517 U.S. 370, 372 (1996).

### a.    *Construction – Claim 17 ("low voltage communication cable")*

In this case, the only general term in dispute is "low voltage communication cable."  While there is not much dispute over what "low voltage" means, there is significant dispute over the specific meaning of "communication cable."  Accordingly, the Court limits its construction to "communication cable" specifically.

Defendant argues that communication cable, as identified in Claim 17, is limited to "<u>data</u> cable," or "<u>data</u> communication cable."  Primarily, Defendant bases this argument on its opinion that the inventor, during his deposition, conceded that the common understanding of one of ordinary skill in the art is that communication cable is limited to cable used for data transmissions (*i.e.*, a data cable).  The Defendant also points to the background section of the patent, which references the inadequacies of prior art supports for running "data" cables when discussing the need to which the invention is addressed.

10

The Court simply does not agree with Defendant's narrow construction of the term "communication cable."  Looking first to the language of the claims, the term "communication" or "communicates" has a much broader common meaning than something that simply references a <u>data</u> communication cable.  Also, Claim 17 itself does not include any language purporting to limit the scope of the term in question.

Further, the Court does not find the patent's specification to be so specific as to justify the kind of narrowing that the Defendant requests.  In fact, the patent distinguishes between "data cable" and "communication cable."  Specifically, the background section references "data" **or** "communications" cabling, which implies that they are different.[5]  The Court has not been provided with the prosecution history of the '994 Patent.  Accordingly, based on the information presently available, the Court finds that the intrinsic evidence provides no basis for limiting the construction of the term "communication cable" as the Defendant proposes.

The Court also finds that none of the testimony presented supports limiting the subject term in the manner Defendant requests.  The Court finds that Mr. Laughlin, the inventor, did <u>not</u> testify that communication cables and data communication cables (or data cables) are one and the same.  Rather, the Court finds that Mr. Laughlin testified that communication cables and data communication cables (or data cables) are "equivalent" to one another; meaning both types of cable can serve similar or equivalent purposes, but they are not necessarily one and the same.

Accordingly, based on the information presently available, the Court finds that the extrinsic evidence also supports the conclusion that the common ordinary meaning of the claim term "communication cable" is <u>much broader</u> than Defendant's requested construction.

---

[5]      *See* '994 Patent, column 2, line 3.

11

Viewing the intrinsic and extrinsic evidence in connection with a full understanding of the Federal Circuit's teaching in *Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. 2005), the Court finds that the kind of precision that would be necessary in the specification to justify a narrowing of the subject claim term from its common ordinary meaning does not exist in this case. Accordingly, the Court construes the term "communication cable" to mean ***"any cable which carries any data or control signal from one point to another in a low voltage system – i.e., that communicates between aspects or elements of a low voltage system."***

### b.  Infringement

Having construed the relevant claim (and term), the Court next considers whether it is *likely* that the Defendant infringed the '994 Patent. There is no claim of direct infringement here; Plaintiff does not assert that Defendant installs communication cable using the method discussed in Claim 17. The only question before the Court is whether the Defendant indirectly has infringed the patent by either (1) inducing infringement or (2) engaging in contributory infringement *via* sale of a product that the Defendant understands is intended for use in an infringing manner. The Court finds that it does not need to address the "inducing infringement" question because it finds that the Plaintiff is *likely* to succeed on its contributory infringement claim.

By their nature and placement, the Defendant's own advertising materials demonstrate that the Defendant's target J-Hook audience is the cabling industry. These materials also show that the Defendant's J-Hooks are specially adapted and expressly sold for use in hanging communication cable(s). Further, the Defendant has failed to establish the existence of any substantial non-infringing use of its J-Hooks. As proposed by Defendant's president, Forrest Dockery, anecdotal (and hypothetical) evidence that a contractor – or anyone, for that matter – might take one of the

Defendant's J-Hooks home and use it to hold a fishing rod in the garage is not evidence of a substantial noninfringing use.  Further, post-litigation efforts to create a non-infringing market are not sufficient to avoid infringement; and the notion that the Defendant may adapt its allegedly infringing product at some point in the future to capture such a market (small as it might be) cannot justify the conclusion that there is a substantial noninfringing use for an otherwise infringing product.  In this regard, the Defendant's testimony, through its president, that it wishes to develop a "general purpose hook" market for its allegedly infringing J-Hook is wholly unavailing.

The Court finds, therefore, that the Plaintiff is *likely* to succeed on its infringement claim(s) in this case; both because it is not likely that the Defendant will be able to prove by clear and convincing evidence that the patent is invalid, and because the Plaintiff is likely to prove by a preponderance of the evidence that the Defendant is engaged, and has been engaged, in acts of contributory infringement.  As further outlined below, the Court also finds that the remaining factors relative to a preliminary injunction analysis militate in favor of entering an injunction in this case.

### B.      Irreparable Harm

Clearly, sales of Defendant's J-Hook are harming the Plaintiff.  That harm, however, is not limited only to lost sales and/or profits, which likely could be mitigated through monetary recoveries.  Rather, continued sales likely will cause irreparable harm to the Plaintiff's reputation in the market because the Defendant's J-Hooks, which appear to be virtually identical to the Plaintiff's J-Hooks (*i.e.*, Defendant admits that it "directly copied" Plaintiff's product J-Hooks), are of an inferior quality.  Indeed, the Defendant's president testified that the Defendant's J-Hook is significantly inferior in quality.  He went so far as to say that his "right" to produce an inferior product for a lower price is "competition" and pursuit of "the American way."

13

The issue presented in a patent infringement action, however, relates to the legitimacy (and legality) of competition, not simply whether it exists.  Clearly, Plaintiff's reputation for making high quality J-Hooks, which easily can be confused with Defendant's lower quality J-Hooks, *likely* will irreparably suffer if Defendant is not enjoined.

C.     **Balance of Hardships**

While the Plaintiff *likely* will suffer irreparable harm stemming from the Defendant's continued sales of its J-Hooks, the Defendant *likely* will suffer <u>very little</u> harm from an injunction. Obviously, no legitimate harm can result from preventing one from engaging in infringement.  That notwithstanding, under the circumstances of this case, an injunction likely will not significantly harm Defendant irrespective of the ultimate outcome of this case because, as the Defendant admits, it does not manufacture its J-Hooks.  Rather, Defendant simply imports them from China.  Accordingly, an injunction will not halt on-going manufacturing activities <u>by the Defendant</u>, nor will it likely result in Defendant's employees losing their jobs.

To the extent the Court either reverses its decision, or ultimately is deemed to be wrong, the Defendant's remaining J-Hooks (if any) can be marketed at some point in the future with minimal inconvenience, much less harm, to the Defendant.  Certainly, the J-Hooks themselves would not be harmed or damaged if warehoused for a period of time.

The Court also does not find the Defendant's laches or delay arguments persuasive.  The Defendant conceded that it was informed of the '994 Patent, given the patent's number, and informed of the fact of the its infringement by the Plaintiff.  Despite that knowledge, the Defendant assured the Plaintiff that it would not engage in any infringing activity.  The Defendant further assured the Plaintiff that it would not sell the J-Hooks that it had on hand.  Despite that assurance,

and as confirmed by Forrest Dockery's testimony, the Defendant sold its J-Hooks anyway, a decision Dockery admitted at the hearing was contrary to the promise he made to Plaintiff.  While the Plaintiff may have taken the Defendant at its word, Plaintiff should not be penalized for that decision, and any resulting delay does not give rise to a laches defense.  The Court finds that there simply is no evidence to support Defendant's claim of laches or delay in the context of this case.

## III.    <u>CONCLUSION</u>

For foregoing reasons, the Court finds that entry of an injunction in this case is appropriate. Accordingly, the Defendant is **<u>PRELIMINARILY ENJOINED</u>** from advertising, marketing, selling or offering for sale <u>any</u> of its J-Hook products – including, but not limited to, its JH21, JH32 or JH64 products – including those in inventory or scheduled for delivery to Defendant or <u>any</u> J-Hook not colorably different than the Defendant's current J-Hook products, for any use, until a final resolution of this case or the Court deems otherwise.

**<u>FURTHER</u>**, **<u>within 10 days from the date of this Order</u>**, the Defendant shall file a notice identifying any alleged non-infringing uses or non-infringing marketing methodologies of its J-Hooks that it asserts should be permitted (*i.e.*, excepted from this Order) given the findings in this Order.  A Case Management Conference will be conducted in this case on June 8, 2006, at 12:30 p.m., where the Court will discuss scheduling and consider whether any uses or marketing methodologies should be excluded from this injunction by a separate order.

For the reasons explained at the March 9, 2006 hearing, bond is **<u>SET</u>** at $10,000.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: May 3, 2006**